## J. COATS and others *v.* HOLBROOK, NELSON & Co.

No person has a right to use the names, marks, letters or other symbols, which another has previously got up or been accustomed to use, in his trade, business or manufactures.

Equity will restrain such deceptive and fraudulent use of trade marks, by injunction, and will decree an account for damages.

It is no answer to the suit, that the simulated article is equal in quality to the genuine manufacture.

Nor that the maker of the spurious goods, or the jobber who sells them to the retailers, informs those who purchase, that the article is spurious or an imitation.

A commission merchant who sells the spurious article, knowing its character, is liable to a suit to restrain its further sale by the proprietor of the trade mark, and will be subjected to the costs of such suit.

The alienage of the person whose trade marks are simulated, and his residence in a foreign country, do not affect his right to their exclusive use, when he has introduced them here.(a)

April 17; July 24, 1845.

---

(a) The great importance of the subject of trade marks and symbols, and the growing interest which it has excited, have induced the author to collect in a note

Coats v. Holbrook.

THE bill in this cause was filed on the 30th of July, 1844, by James, Peter and Thomas Coats, manufacturers, constituting the firm of J. & P. Coats of Paisley in Scotland; against L. Holbrook, T. S. Nelson and W. E. Shepard, commission merchants in the city of New York, trading under the name of Holbrook, Nelson & Co.

The bill stated that the complainants for several years, have been the manufacturers and sellers of spool cotton thread used for sewing, and have forwarded the same to their agents for sale in the city and state of New York, and elsewhere in the United States, where they have resident agents to make sales, and to protect their rights. That they have for years dealt in such thread in New York and elsewhere in the United States, and their sales have been very great. That with a view to make an honest and superior article of thread, they have gone to an expense of upwards of $70,000 upon machinery ; and they have succeeded in making their thread a first rate article in the American market, as well as to its quality and goodness, as to the fairness of the alleged quantity or length at which it is advertised to be sold. No thread in the market sells higher or more readily, and for a long time it has been well known publicly, as well as to the principal dealers. That manufacturers of thread designate the fineness and the number of cords or strands used in making it, by numbers ; the lower numbers indicating the coarser kinds, and the higher numbers the finer quality and larger number of strands. The complainants thread as numbered from 8 to 40, are threads of six

---

at the end of this case, the recent authorities relative to this branch of the law, both here and in England. Since the decision of *Coats* v. *Holbrook*, the case of *Taylor* v. *Carpenter*, cited in the opinion of the court, has been decided, on an appeal from the Chancellor's decree, in our court of last resort ; so that several of the propositions held in the case of Coats, are now definitively settled in this state. The note appended, contains a full report of *Taylor* v. *Carpenter*, both in the Court of Chancery, and in the Court for the Correction of Errors. It also contains a report of a very recent trade mark case, first decided by Vice-Chancellor Sandford, and his order affirmed on appeal by Chancellor Walworth, on the 25th of January, 1847.

The great interest felt in these questions by the manufacturing and commercial world, is illustrated by the fact, that the judgment of the Assistant Vice-Chancellor in *Coats* v. *Holbrook*, was noticed at some length in the London Times soon after it was pronounced, and was stated at large in the Liverpool newspapers.

cords, while those from 40 to 70 are of four cords, and from 70 to 150, are threads of three cords. Their thread when made, is wound on wooden spools or reels, each spool containing a length of 200 yards. At the end of each spool, a circular paper label in black and gilt is put on before the thread is ready for sale, and is on it when sold. The label contains the words " J. & P. Coats Best Six Cord," on the outer edge of the circle, and within those words, the letters, &c., "200" Yds.," and "20," or such other number as the quality of the thread requires; and these marks distinguish their thread from that of other manufacturers, and has been and is known as such to the public. That the spools when labelled, are put up in quantities of twelve, in drab or brownish paper wrappers, each parcel being tied with a twine, and having on its outside a label like that before described, and also an engraving or cut, representing three shields together with a lion and an eagle as supporters, with the following printed under the same; " Best Six Cord Spool Cotton. J. & P. COATS. Warranted 200 Yards."

The bill further stated, that finding a spurious and inferior article of thread, bearing a forged label and impression on the wrapper, of the character, style and firm name used by the complainants, had been secretly brought into the market and largely sold in the city of New York, and other parts of the United States, as the thread so made by them; the complainants by their agent resident in that city, set about tracing out the wrongdoers, and at length found a retail merchant who had bought the spurious article of a jobber in Cedar street, named Hazleton. That Hazleton, when called upon, gave Holbrook, Nelson & Co. as the venders of the article to him. That the latter firm have for some time been selling and continue to sell a spurious article of cotton thread on spool or reel, as and for the complainants thread, well knowing it is spurious. That the thread which they are thus selling is put up on spools, with a label at each end, with the complainants firm name thereon, and in other respects similar to theirs, and the spools put in wrappers similar to those used by the complainants, and having a similar cut or engraving and similar words printed under it. (The complainants attached to their bill, specimens of the genuine labels put on the

ends of their spools; and of the genuine wrappers used upon the parcels when put up in dozens, with the cut or engraving and printed letters and figures.   They also attached specimens of the spurious labels and wrappers put upon the thread sold by the defendants.   The latter were an exact imitation of the former in the letters and figures printed, and in the general appearance, color, &c. of the label and the cut or engraving, but the cut itself was not as finished as that on the genuine wrappers.   The number on the specimen attached was 35.)   The bill further alleged that the defendants well knew that the complainants were such manufacturers and venders of the thread known as J. & P. Coats's, as charged in the bill.   That with a fraudulent design to put off an inferior or spurious article, by that means to draw away the customers the latter would otherwise enjoy in the sale of their thread, the defendants have knowingly sold such inferior or spurious thread in large quantities to Hazleton and to others, with a view to have it again sold by jobbers and retailers, so that the same might be fraudulently palmed upon and bought by persons requiring the complainants thread, as the genuine article so manufactured and sold by them.   That the spurious label as well as wrapper, state or show or would give a buyer to believe, that the thread is one made from or with six cords, and that the quantity on each spool ran or measured to the length of two hundred yards; but in proof of such fraud· or cheating, the spurious thread is only made with three cords or strands, and was only about one hundred and fifty yards in length on each spool. That the defendants have sold large quantities of this article as the original article so made and sold by the complainants; and if they are not the makers of it, they know who are or is the maker and getter up of the spurious article and of the cut and label, and the engraver and printer thereof; and the bill claimed a discovery in these particulars.

That the complainants were the first to use publicly in selling their thread in the United States, the label and wrapper before described.   That their price has been and is 45 cents a dozen for cash, and 47½ cents a dozen at eight months credit; whereas the spurious article coming from the defendants is selling from 25 to 37½ cents a dozen.   And the complainants have suffered

serious injury in consequence of such fraudulent conduct of the defendants.

The bill prayed for a full and minute discovery ; that the defendants might account for all the profits made by the sale of the spurious thread, and compelled to deliver up to be destroyed, all that remained in their hands, as well as all the labels and wrappers, and plates, blocks, types and dies for printing the same ; and for a preliminary and a perpetual injunction against the further sale or use of the spurious thread and the counterfeit labels and wrappers ; and that the defendants pay the costs of the suit.

The answer admitted the material allegations of this bill as to the complainants manufacture and sale of the Coats thread, and its trade marks, standing and character, and of their being the first to use such marks ; upon information derived by the defendants since the bill was filed.  They stated that their business is selling domestic goods on commission.  That on the 28th of May, 1844, one Malcolm McGregor, of Newark, in the state of New Jersey, a· manufacturer of cotton thread, sent to them to sell for his account, on commission two cases, each containing one hundred dozen spools or reels of cotton thread.  The spools were labelled like those stated in the bill, and when received and when sold, were put up in quantities of twelve, in yellow paper· wrappers, tied with twine and labelled on each side with labels like those on the spools, but not having any cut or engraving thereon.  Shepard, one of the defendants, in two days afterwards, sold the two cases to D. G. Hazleton at the price of 27½ cents per dozen, payable in thirty days.  In July, Shepard received from McGregor, two more cases of the same thread.  Of these, one hundred and fifty dozen were in wrappers like those first sent, and fifty dozen were in drab or brownish wrappers, with a cut or engraving, being such wrappers as are described in, and one of which is annexed to the bill.  These cases were sold to Hazleton at 37½ cents per dozen on a credit of eight months.  The defendants also received with the first cases, a few sample spools which have not been sold.  With these exceptions, they have never manufactured, sold, or had in their possession, any cotton thread purporting to be made or manufactured by the complainants, or having like names, marks or wrappers.  On Hazleton's

calling on them, after the agent of the complainants had visited him, they authorized him to furnish their names as the sellers to the agent; but the latter never called on them, or made any complaint, or requested them to desist from selling. Shepard knew the thread he received was manufactured by McGregor; but neither he or they, ever sold any of it, professing it to be the complainants' thread or made by them, or sold any with a design to put off an inferior or spurious article, or to draw away their custom, or to palm off the thread as the genuine article. On the contrary, Shepard sold it to Hazleton informing him it was an imitation article made in this country, and he sold it as a thread made of three strands. He supposed the spools to run each two hundred yards in length of the thread, until since the bill was filed. On measuring one of the spools since, it was found to run one hundred and ninety yards. McGregor was the sole maker and getter up of the article of thread which they sold. They are informed that he procured an engraver in Boston to prepare the plate for the cuts and labels.

The defendants denied all fraudulent conduct, as well as the alleged injury to the complainants from their acts. They would have desisted at once, if they had been informed of the complainants rights and been requested to desist. They never had in their possession any of the cuts, engravings or labels, except those on the thread received from McGregor; nor any of the dies, plates, blocks or cuts.

The answer then set forth the defendants offer after the bill was filed, accompanied with a statement of their connection with the matter, to pay to the complainants agent the commissions they had received on the sales, to deliver up the sample spools on hand, to pay the complainants costs, and to promise in writing never to receive or sell any more of such thread; provided this suit should be discontinued; which offer was declined, the agent requiring an answer to be put in to the bill.

The answer alleged that no one of the complainants is a citizen or a resident of the United States, but they are all subjects of the Queen of Great Britain and Ireland.

The defendants examined Hazleton as a witness who testified that he bought the thread of them as an imitation or a spurious

article, and never sold it except in the same manner. Shepard told him it was an imitation of Coats's thread, was only of three cords, and he would not warrant its length.

It was put up in wrappers with labels and an engraving as stated in the bill. Shepard offered to sell the witness a large quantity after his first purchase, but at a higher price. The price then came near to Coats's, and that, with the loss of reputation in selling a spurious article, weighed in his opinion against the transaction. He sold nearly all he received, by the case of a hundred dozens.

*Charles Edwards*, for the complainants, made the following points.

I. The complainants are entitled to a perpetual injunction.

II. The defendants knowingly dealt in the spurious article, and were ready to furnish large quantities. They must pay full costs.

III. The decree should be for a perpetual injunction and costs of suit, with liberty, should the complainants require it, to have a reference to a master to ascertain and report the amount of their damages, and a decree that the defendants pay the amount of such damages, upon the coming in and confirmation of the master's report. (*Taylor* v. *Carpenter*, MS.)!

Mr. Edwards cited, *Blanchard* v. *Hill*, (2 Atk. 484;) *Knott* v. *Morgan*, (2 Keen's R. 213;) *Ransom* v. *Bentall*, (3 Law Journal Rep. N. S. part 2d, p. 161;) *Gout* v. *Parkinson*, (5 London Legal Observer, 496, 1833;) *Sykes* v. *Sykes*, (3 B. & C. 541; S. C. 5 Dowl. & Ryl. 292;) *Taylor* v. *Carpenter*, before Judge Story, MS. and in 7 Law Reporter, 437; and case with the same title before Chancellor Walworth.

*J. Butler Wright*, and *J. Angus Manning*, for the defendants, made the following points.

I. The material allegations of the bill of complaint are shown to be untrue. The bill should therefore be dismissed with costs.

1st. It appears that the defendants have not used the trade marks of the complainants. Because the defendants did not manufacture the thread which was sold by them. They sold it

merely in the ordinary course of their business as domestic commission merchants, having no interest in the sale excepting the the usual commission. Defendants might have moved upon the answer for a dissolution of the injunction.

2. The facts and circumstances attending the sale by defendants, affirmatively show their perfect good faith in the transaction. It appears that the purchaser was truly told that the thread sold was a domestic article manufactured in New Jersey. Whilst the bill charges that the defendants had made large sales of a spurious article, falsely and fraudulently representing the same to have been manufactured by the complainants. Fraud is the basis of the bill, and the charge of fraud wholly fails. Complainants have failed to show such a user, much less a fraudulent user of the trade marks, the gist of the whole complaint.

3. The complainants have failed to show a continued intention on the part of the defendants, to make further sales. This in any case, would be necessary proof to entitle them to a perpetual injunction.

II. Even though a perpetual injunction should be granted, the decree will be on payment of the defendants costs.

1. The complainants should have inquired of the defendants for the information to be discovered before the filing of the bill.

2. The defendants are involved in a litigation entirely unnecessary.

3. Costs in a chancery suit rest in the sound discretion of the court upon a view of all the circumstances of the case.

III. The prayer for a receiver must be denied because the sum which the complainants under any view of the case would be entitled on taking the account, is so small that the court would consider it an abuse of its jurisdiction to bring the cause to a hearing for such a paltry sum.

IV. In any event, the defendants should be allowed the costs subsequent to the time when they offered to do every thing which the complainants in their bill of complaint ask for.

Messrs. Wright and Manning, cited *Millington* v. *Fox*, (3 Mylne & C. 338;) *Townsend* v. *Lawrence*, (9 Wend. 458;) *Eastburn* v. *Kirk*, (2 J. C. R. 317.)

THE ASSISTANT VICE-CHANCELLOR.—The principles applicable to this case are well settled.

A man is not to sell the goods or manufactures of B., under the show or pretence that they are the goods or manufactures of A., who by superior skill or industry has established the reputation of his articles in the market. The law will permit no person to practice a deception of that kind, or to use the means which contribute to effect it. He has no right, and he will not be allowed, to use the names, letters, marks, or other symbols by which he may palm off upon buyers as the manufactures of another, the article he is selling ; and thereby attract to himself the patronage that without such deceptive use of such names, &c., would have enured to the benefit of that other person who first got up, or was alone accustomed to use such names, marks, letters or symbols.

One of the earliest cases reported in full is *Gout* v. *Aleplogu*, (6 Beav. 69, note, and 1 Chitty's Gen. Pr. 721.) Gout had been in the habit of manufacturing watches for the Turkish market, where they were known by the marks engraved on them, and had acquired great repute. The marks were on the inside of the watch, and consisted of his name in Turkish characters, and the Turkish word "*Pessendede*," which signifies *warranted* or *approved*. There was also "*R. G.*" and a crescent put in relief, and a sprig and crescent.

The defendant procured Parkinson to make watches for him, and had engraved on the same part of the watch as Gout was accustomed to do, the words "*Ralph Gout*" and "*Pessendede*" in Turkish characters; which watches the defendant consigned to Constantinople and sold there to the prejudice of the complainant's trade. Vice-Chancellor Shadwell granted an injunction restraining Aleplogu from sending or permitting to go to Constantinople or Turkey, or to any other place, and from selling and disposing of any watches with Gout's name, or the word "*Pessendede*," thereon in Turkish characters, or any watches in imitation of Gout's watches; and also restraining the defendant and Parkinson from manufacturing or vending such watches.

A similar decision was made in the plough case, *Ransome* v. *Bentall*, before the Vice-Chancellor, (3 Law Journal Rep. N. S.

161,) and the omnibus case, (2 Keen's R. 213,) *Knott* v. *Morgan*, before Lord Langdale, Master of the Rolls; and Day & Martin's blacking, *Day* v. *Binning*, (1 Coop. Ch. R. 489,) V. C. Shadwell.

Another in an action at law for damages, will be found in *Sykes* v. *Sykes*, (3 B. & Cres. 541,) where the manufacture simulated was shot belts and powder flasks, stamped " *Sykes' Patent.*"

And in *Millington* v. *Fox*, (3 Mylne & Cr. 348,) the principle was sustained by Lord Cottenham, in a suit relative to the " *Crowley*" steel.

In *Taylor* v. *Carpenter*, before the Chancellor, decided on the merits, December 3, 1844, (4 Barbour's Abstract of Chancellor's Decisions, 68,) I prepared the bill as counsel. The complainants, residing in England, had long been the manufacturers of cotton thread, known as " *Taylor's Persian Thread*," which had acquired an extensive and valuable reputation in the United States, where they sold large quantities of it. Their thread was put up upon spools, with a printed paper label on each end of the spool, and a certain number of the spools were placed in a paper envelope which was stamped with the name of the thread. The defendant had commenced the manufacture in Massachusetts of a simulated Taylor's Persian Thread, and had introduced it into the city of New York for sale. His imitation extended to the appearance and color of the spools and paper labels and envelopes, as well as the use of the name and title of the thread. In his defence, the defendant insisted that his manufacture was equal in quantity and value to the genuine article; and that the complainants were subjects of a foreign government, and that he as a citizen of the United States had a right to use the marks and names in question.

The Chancellor held that the quality of the imitation was immaterial, and that the alienage of the complainants did not alter their rights. And he decreed a perpetual injunction with costs, together with an account as to damages.(a)

A suit between the same parties, soon after the filing of the bill

(a) This case is reported more at large in a note at the end of the opinion.

here, was instituted in the Circuit Court of the United States, in Massachusetts, on the equity side of the court.    Judge Story sustained an injunction, granted on filing the bill.

The defendant put in an answer and proofs were taken, upon which the cause came to a hearing before the same eminent judge, in November, 1844.    The answer admitted the imitation of Taylor's black spools and their stamped envelopes, but alleged that the defendant had never sold any of his manufacture as *genuine* Taylor's thread, nor without informing purchasers that they were of his own manufacture ; and it set up that the Taylor's were aliens, and that the defendants were not accountable to any foreign manufacturer, for using in this country the names, trade marks, &c., of such manufacturer.    The answer also alleged that the defendant's thread was equal in quantity and quality to Taylor's.    It was also set up that other persons were engaged in imitating the complainant's names, spools and labels. The proofs disclosed that the defendant had imitated and sold both the red and black spools and labels.

Judge Story, in a pointed opinion, (with a copy of which I have been furnished,) scouted these various grounds of defence, and decreed a perpetual injunction, with the costs of the suit. (*Taylor* v. *Carpenter*, defectively reported in 7 Law Reporter, 437.)

The legislature of this state has recently declared its reprobation of this kind of piracy, in the "Act to punish and prevent frauds in the use of false stamps and labels," passed May 14, 1845.    (Laws of 1845, chap. 279, page 304.)    This act makes it an offence punishable by fine and imprisonment, either to counterfeit such stamps or labels with intent to defraud, or to vend goods, &c. thus stamped, without disclosing the fact to the purchaser.

In this case the attempted imposition upon the public by the manufacturer of the simulated article, is too barefaced to be questioned.

The defendants are merely venders of the spurious goods, and they suppose that they are, on various grounds, exempted from the consequences which would be visited upon the manufacturer. Thus it is said that they have not used the trade marks of the

complainants, that they merely sold for McGregor on commission in the usual course of their business, and have acted in perfect good faith.    Indeed, they go so far as to say in their answer, that they had no information of the complainants rights, or of their manufacturing Coats's thread, until after the defendants had sold for McGregor.    How this could be true of the defendant, who sold McGregor's thread as *an imitation article made in this country*, (such is the statement in the answer,) I cannot understand.

Then as to the good faith and morality of the transaction ; and in all that I have to say, I refer to the defendant who alone acted in the sales.    The defendants received for sale from McGregor, an imitation thread, carefully put up, labelled and stamped, as thread made by J. & P. Coats.    They probably knew that there was such a house as J. & P. Coats who made the genuine thread. If they did not, they knew perfectly well that some person other than McGregor, made such genuine thread, that it was called " Coats's," and it was in high repute in this market.    They therefore knew that the article they were selling was spurious ; that it was going out to the public under false and deceptive colors, and was designed and well calculated to take in purchasers who were in pursuit of the genuine thread.    They admit that they knew it was only a three cord thread, although it was stamped and labelled " *J. & P. Coats Best Six Cord.*"

Knowing all these things, they sold it, and so far as they could, put it in the way of imposing upon and swindling the community.

But it is said that upon their sale to the jobber, by whom it was to be again sold to the retailer, the defendants told the jobber, truly, that it was an imitation of Coats's thread ; in short that they sold it as a spurious article.    But what then ?    Did they imagine that the jobber would be equally frank and communicative to the retail merchants and shopkeepers, and that every one of the latter would carefully inform every customer who bought a spool, that the thread was an imitation of Coats's, made in New Jersey, and only three cord instead of six ?

The idea is preposterous.    Trade marks, names, labels, &c. are not forged, counterfeited or imitated, with any such honest

design or expectation. McGregor's thread was labelled and stamped with Coats's name and marks, so that it might be palmed off upon the consumer as being made by Coats. And every man who sold it, whether he made five per cent. or fifty per cent. by the operation, lent himself to the perpetration of the fraud.

I have looked into the point of good faith in reference to costs, and not because I deemed it to be of any consequence in respect of the injunction. (See *Millington* v. *Fox*, above cited.)

The question of costs remains to be disposed of. There was no occasion for the complainants to apply to the defendants before filing their bill. They found the latter participating in a gross violation of their rights, under circumstances where it was not supposable that the defendants were ignorant of the wrong. The same consideration shows that the litigation cannot be deemed to have been unnecessary.

The costs subsequent to the bill and injunction, stand upon a somewhat different footing from the others.

The defendants had disclosed the manufacturer to the complainants agent, and offered to give up their profits on the sale, to pay the costs up to that time, and to stipulate in writing not to sell any more of the spurious thread.

If it had turned out that they were ignorant of the spuriousness of the thread which they sold, the case would have been within the opinion expressed by Lord Cottenham in *Millington* v. *Fox*, and I think they would have been relieved from the subsequent costs. But the offer was not made till about the time the answer was due ; in fact, it was on the day the answer was filed. It was not accompanied with a proffer of a perpetual injunction, to which the complainants were entitled, and for which the proposed stipulation was not a reasonable substitute ; but it required the bill to be dismissed.

And finally, it turns out by the answer, that the defendants were not guiltless of abetting McGregor's fraud. I cannot under these circumstances, relieve them from any part of the costs.

Decree for a perpetual injunction, and the costs of suit.

## NOTE.

Before giving the report of *Taylor* v. *Carpenter*, and *Partridge* v. *Menck*, as promised at the head of this case, the note will contain the recent English decisions stated in brief, as also two or three of an earlier date.

In *Lewis* v. *Langdon*, (7 Simons, 421,) the question arose on the use of a partnership name, as a trade mark, after a dissolution by the death of one of the two partners. One of the executors of the deceased, commenced the use of the firm name as such trade mark; the survivor with a new partner, continuing its use as formerly. On a bill filed by the survivor and his new partner against the executor, Vice-Chancellor Shadwell on motion, granted an injunction restraining the latter from using the name of the late firm in carrying on his business.

In *Pidding* v. *How*, (8 Simons, 477,) where the bill was filed to restrain the use of a trade mark on tea, called "Howqua's Mixture," the court, on the ground that the complainant was shown to have used false representations to the public about the mode of procuring and making up his mixture, refused to allow an injunction until he should establish his title at law. At the same time, the Vice-Chancellor said the defendant was not at liberty to make and sell a mixture of his own, under the same designation as the plaintiff had appropriated.

A similar decision was made by Lord Langdale, Master of the Rolls, in *Perry* v. *Truefitt*, (6 Beavan, 66,) relative to the "Mexican Balm for the Hair;" because the complainant in his labels and cards, described his own article as having been prepared from an original receipt of the learned Von Blumenbach; when in truth, its inventor was a man of a much less sounding name, and of no note at all.

In *Croft* v. *Day*, (7 Beavan, 84,) the "Day & Martin Blacking," which figured in Cooper's Rep. 489, again came before the court. The genuine blacking was put up in bottles with a label, &c., containing as the place of manufacture "97 High Holborn," and the article was made by the executors of the surviving partner of Day & Martin, who continued the business in their name. The defendant, Day, a nephew of the testator, associated with a person named Martin, and set up a blacking manufactory, using the old firm name, and labelling their bottles in a manner closely resembling those of the old establishment. In the cut on the label, they however substituted the royal arms for those of the original firm, and inserted "90½ Holborn Hill," in the place of "97

High Holborn." Lord Langdale said the defendants contrivances were calculated to mislead the bulk of the unwary public, into the impression that the new concern was connected with the old manufactory ; and thus to benefit the defendant, to injure the plaintiff, and to deceive the public ; and he therefore directed an injunction to issue.

Much like the principal case in the text, is the very recent decision in *Pierce* v. *Franks*, before Sir Knight Bruce, V. C. January 13, 1846 ; (15 Law Journal, Chy. Rep. N. S. 122 ; S. C. 10 London Jur. Rep. 25.) There the complainant was in the habit of selling tooth brushes and nail brushes on which were stamped " Smyth's Bond Street," that being the trade mark to which he was entitled ; and they also had stamped on them certain figures and letters which were his private marks, and were used to distinguish the different sizes and patterns. The bill alleged that the defendant made and sold brushes which were stamped with the same words and the same private trade marks. An injunction was granted, restraining the defendant from selling brushes on which " Smyth's Bond Street," were stamped.

In his answer the defendant stated he had made such brushes to fill two orders only, both of which he then believed were given by the complainant's agent ; he had no wish or intention to use the complainant's marks without his consent, or to his injury ; and that if the complainant had applied to him he would have desisted, and undertaken not to use the trade marks, and no bill was necessary. He denied that the private marks were the complainant's and alleged they were generally used in the trade. And he insisted that the suit was vexatious, and that he ought to have his costs. The cause was heard on bill and answer. The court decreed a perpetual injunction, and charged the defendant with the costs of the suit, except such as were occasioned by the allegation as to the private marks.

Cotemporary with the last, is *Hine* v. *Lart*, decided by Vice-Chancellor Shadwell, January 12, 1846, (10 London Jur. Rep. 106.) The complainants claimed a right to a trade mark in the word " Ethiopian," upon black cotton stockings, with certain black lines above it, as having been acquired by them and a former partner deceased. They alleged a violation of their rights by the defendants, in the use of the same marks in fraudulent imitation of the complainants, and they prayed for an injunction and an account of profits. The answer denied the complainants' right to the trade mark, alleging that other parties used it before they or their former partner did ; but the defendants admitted that they had manufactured stockings largely, with the same marks, which

were in imitation of or a copy from those which the complainants claimed. The answer stated that the defendants so used it without any intention to defraud or injure the complainants, or of passing them off as the manufacture of the latter. Affidavits were filed on both sides, respecting the complainants right to the trade marks, which were very contradic-tory.

The Vice-Chancellor said that it might be that the personal representa-tives of the complainants deceased partner might have a right to use the same mark, but that the complainants had sufficient right to bring for-ward the case, whether the title was in them alone, or jointly with the representative. That it was evident from the defendants making so perfect an imitation of the complainants marks as they had done, the difference being merely nominal ; (although they claimed to think the complainants had no beneficial right to the mark ;) that they knew they might gain an advantage by it, to which they were not entitled. He refused to dissolve the injunction, and directed the complainants to bring an action at law to try their right to the trade mark.

Some cases in the courts of law, will now be mentioned.

In *Blofield* v. *Payne*, (4 Barn. & Adolph. 410,) in an action on the case, the plaintiff was the manufacturer of a metallic hone for sharpen-ing razors, which he was accustomed to wrap up in certain envelopes containing directions for its use and other matters ; the same being in-tended and serving to distinguish his hones from those of other persons. It appeared on the trial, that the defendants had obtained some of the plaintiff's wrappers, and used them wrongfully upon hones of their own manufacture, and sold such hones as and for the plaintiff's, for their own gain. No proof was given of any actual damage to the plaintiff. The jury found for the plaintiff with one farthing damages, and stated that they thought the defendants hones were not inferior to the plain-tiff's. The defendants then moved at bar for a nonsuit, but the court held that the plaintiff was entitled to recover some damages, by reason of the fraudulent use of his wrappers, and refused to grant a rule to show cause. The case decides that it is no answer to such a suit, to show that the simulated article is as good as the genuine manufacture.

*Morison* v. *Salmon*, (2 Mann. & Grang. 385,) was an action on the case for damages by reason of the pirating of a medicine called " Mori-son's Universal Medicine," which the plaintiffs claimed to have pre-pared and sold for profit for many years, put up in boxes with a label thereon as above ; and which had acquired great fame and reputation with the public. The defendant, it was alleged, intending to injure the

plaintiffs, had fraudulently prepared and sold medicines in imitation of theirs, put up and labelled in the same manner, in order to denote that his was the genuine medicine prepared and sold by the plaintiffs, and that the defendant fraudulently sold such imitation for his own lucre and gain. After a trial on a plea of not guilty, where the plaintiffs recovered a verdict; the defendant moved in arrest of judgment. The Court of Common Pleas denied the motion, on the ground that the declaration disclosed a false representation in this, that the defendant sold the medicines made by him as and for those made by the plaintiffs.

*Crawshay* v. *Thompson*, (4 ibid. 357,) was an action on the case, in the same court, for using the plaintiff's trade mark on bars of iron; both of the parties being iron manufacturers and exporters. The defendants had a verdict, and on a motion for a new trial, it was held, that it was properly left to the jury under the pleadings in that cause, to say whether the defendants mark bore so close a resemblance to the plaintiff's as was calculated to deceive the unwary, and to injure the sale of the plaintiff's goods; and secondly, whether the defendants used the mark with the intention of supplanting the plaintiff, or whether it was done in the ordinary course of business in execution of orders, without such intent. Also, that the notice of the resemblance of the mark, given by the plaintiff to the defendants, did not *in the absence of proof of any intention to imitate it* on the part of the defendants, give the plaintiff any cause of action; it being expressly alleged in the declaration that the defendants *knowingly* used it in imitation of the plaintiff's mark.

This allegation was held to be material by two of the three judges, who delivered their opinions at large.

Coltman, J. said " if there was such a similarity as might impose on ordinary persons, and it was shown that it was calculated to mislead, the plaintiff would have been entitled to a verdict; for the intention to deceive would have been manifest."

Maule, J. said " the gist of the action is the selling of the defendants manufacture, as and for iron of the plaintiff's manufacture; and it would be sustained by proof that the defendants had sold their iron to their correspondents, for the purpose of being retailed as the plaintiff's manufacture." He then mentioned the express *scienter* alleged in the declaration, and remarked that he thought the declaration would have been good without that allgation. He further said, .that the first question submitted to the jury was in effect, whether the iron made by the defendants was made so as to imitate the iron of the plaintiff; and that it was a material question. As to the defendants

purpose to supplant the plaintiff in the market, or whether their acts were done in the ordinary course of business and merely in execution of foreign orders sent to their house ; he said " it was equivalent to putting the question whether they had sold their iron as and for the plaintiff's ; because if they had done so, it would have a natural tendency to supplant the plaintiff in the market, and then the intention to defraud would follow as a matter of law, as well as of common sense." The judge agreed that if the defendants sold their iron as and for the plaintiff's, they were liable, whatever may have been their motive in so doing.