# IN SPECIAL TERM.

## Levi Sohl *et al v.* James C. Geisendorf *et al.*

*Application for injunction for infringment of Trade Mark.*

A party purchasing part of a trade mark, and adopting the balance, will be protected in his title to the former, as well as the latter.

The use of some word, letter, or character, of a trade mark, by different parties, without hindrance, will not work an abandonment by him in whom its right of use, and title is vested.

A trade mark composed of such devices as denote simply, quality of an article, will be protected, especially if it is once established.

It is an infringement of a trade mark, even though the imitation and original, when placed side by side, would not mislead, if the similarity is such that a difference would not be noticed when seen at different times or places.

*Gordon, Browne & Lamb,* for plaintiffs.

*Taylors, Mitchell & Ketcham,* for defendants.

Rand, J.—This is an application for an injunction, enjoining the defendants from using a trade mark, which plaintiffs claim belongs to them.

It appears from the affidavits filed, that in 1859 James L. & Walter N. Evans were partners and millers at Noblesville, and employed one Roberts, of New York city, to get them up a brand or trade mark with which to mark a certain grade of flour which they manufactured. Roberts got up one, some of the distinctive features of which were the words, " White Rose Mills," " Snowflake," a double row, and the word " Family "—and perhaps " Flour "—which the Evans adopted and used until they sold out their mill, in 1861, to Nathan Sohl and John L. Wild, and transfered to them said mill and its appurtenances, including the said trade mark or brand.

Nathan Sohl and Wild carried on said mill, and used said trade mark, and afterwards sold an interest in the mill and business to Levi Sohl, and the business was carried on in the name of Sohl, Wild & Co., who continued to use said brand or trade mark.

In 1864 said firm of Sohl, Wild & Co., purchased a mill in Indianapolis, and continued to run both mills, using said mark or brand at both. About this time Alfred I. Sohl became a partner, and at this time, or perhaps some time previously, the trade mark was added to or changed, so as to appear as the exhibit, filed with the complaint, marked " A,"

except the firm name was afterward changed as hereinafter stated. David Gibson also became a member of the firm; Nathan Sohl sold out his interest and withdrew; the firm name was changed to Sohl, Gibson & Co.; their name, " Sohl, Gibson & Co." was inserted in the brand or trade mark, in place of the old firm name, and said last mentioned firm have continued to use the said brand or trade mark ever since. In 1870 they sold the mill, in Noblesville, back to the Evans, but they have continued to run the mill, and use said brand or trade mark at Indianapolis, and are still doing so.

The defendants have a mill at Indianapolis, and are using the brand or trade mark " B," exhibited in the complaint, upon their flour, and are selling the flour throughout the country.

The defendants resist the application for an injunction upon the following grounds:

*First*, That plaintiffs never had an exclusive right to the trade mark they use—in fact never owned it.

*Second*, If plaintiffs ever owned said trade mark, and had an exclusive right to it, they have abandoned such exclusive right by permitting other parties to use it.

*Third*, That said plaintiffs' trade mark is composed of such letters, words, or characters as denote the quality of the article to which they are affixed, and therefore can not be the subject of an exclusive trade mark.

*Fourth*, That defendants obtained from Nathan Sohl, one of the former proprietors of said trade mark, the right to use it.

*Fifth*, That there is such a dissimilarity between the trade mark of plaintiffs, and the one used by defendants, as to be no infringment of plaintiffs' mark.

We will briefly notice these several propositions in their order:

*First*, As to plaintiffs' exclusive right. It appears from the

affidavits on file, that, at least a part of said trade mark was used by the Evans in 1860; that it was transfered to their successors in the mill property and business in 1861, and has been handed down, or transfered to the several firms that have succeeded the Evans, until about 1864, when the trade mark now in use, and made exhibit " A " in plaintiffs' complaint, was adopted and used by plaintiffs under the different firm names which have succeeded each other. Each firm appears to have succeeded to the rights of its predecessor. The authorities establish the proposition that a trade mark may be devised and adopted by the party himself, or he may acquire it by purchase from his predecessor. The mode by purchase is as effectual as any other, and Courts will go as far to protect such trade mark as if the party devised and adopted it. I hold that the plaintiffs have shown a good title to the trade mark they use, if it should be held a trade mark at all. I know of no reason why a party can not purchase a part of a trade mark and *devise* and adopt the balance.

See *Millington* v. *Fox*, 3 Myl. and Cr.; *The Joseph Dixon Crucible Co.*, v. *Meyr Gagginhien*, 3 American Law Terms, 288; *Craft* v. *Day*, 7 Beavan, 84; *Tilly* v. *Fasset*, 17 American Law Reg., 402; *Coffin* v. *Branton*, 4 McLean, 516.

*Second*, As to plaintiffs having abandoned the mark. There is no evidence showing that other persons, than the plaintiffs, their predecessors, and the defendants, have used the plaintiffs' trade mark in its present or previous forms, unless the Evans did after they bought back the Noblesville mill in 1870, and if they did, it was without the plaintiffs' consent, and at their request the Evans abandoned its use.

It is true that there is evidence that different parties have used at various times, some word, letter, or character, which composed the plaintiffs' entire mark; but I do not think this is sufficient to establish an abandonment of their mark by plaintiffs. Many of the authorities hold that the defense

that others have pirated the same mark, is only an aggravation of the offence.

*Third,* As to the mark indicating quality, and therefore not entitled to protection. I find some authorities that hold that there can be no exclusive right to a trade mark, which only denotes the quality of the article manufactured. I believe, however, the weight of authority is the other way. The later, and it seems to me the better authorities, establish the proposition that a trade mark may be composed in part, if not entirely, of words, letters, and characters, that denote the quality of the article.

If a trade mark is once established, I hold, whatever its design, it will, to some extent, necessarily indicate to the public the quality of the article. But if I am mistaken in this, still I am of opinion that the plaintiffs' trade mark does designate much more than the simple quality, or quantity of the flour in the barrel, and therefore is entitled to protection from infringement.

See *Clark* v. *Clark,* 25 Barbour, 76 ; also 416 ; 47 Barbour, 455 ; *Sexion* v. *Provigendo,* 1 Ch., Appeal Cases; *Coats* v. *Holbrook,* 2 Sanford's Ch. Reports, 586, and notes and authorities cited.

*Fourth,* As to the defendants' claim of right under Nathan Sohl. The defendants claim to have obtained, from Nathan Sohl, one of the former proprietors, the right to use the plaintiffs' trade mark. Nathan Sohl had sold out his right to said trade mark to his partners, before the defendants claim to have obtained the right from him. He could not confer on the defendants a title he had previously parted with. This is too plain for argument, or to need authority.

*Fifth,* As to the similarity of the two marks. The exhibits of plaintiffs' and defendants' trade mark, set out in the complaint as exhibits " A " and " B," have certainly a striking resemblance, and in the opinion of the Court, the defendants' is well calculated to deceive the general purchaser, who

Sohl *et al v.* Geisendorf *et al*

might be seeking the plaintiffs' brand of flour. If the two marks were seen at different times or places, a majority of purchasers would not distinguish the one from the other, unless their attention was specially called to the difference. If such be the case, the law is well settled, that the defendants' trade mark is an infringement of the plaintiffs', even if the marks, side by side, would not mislead. But these two trade marks, when placed side by side, would mislead many, if not a majority, of purchasers.

It is the opinion of the Court, that the similarity of the two marks is so great that defendants' is a palpable infringment of plaintiffs'.

*Clark* v. *Clark*, 25 Barbour, 76; *Brooklyn Company* v. *Maury*, 25 Barbour, 416; *Eddleson* v. *Vich*, 23 Eng. Law and Equity Reports; *Amoskeag Co.* v. *Sprears*, 2 Sanford Superior Ct. Reports, 599; *The Joseph Dixon Crucible Co.* v. *Meyr Gagginhien, et al*, 3 American Law Tirms, 288, and authorities there cited; *Sexio* v. *Provigendo*, 1 Ch. Appeal Cases, 191; *Coats* v. *Holbrook*, 2 Sanford's Ch. Reports, 584, and the cases there cited.

Upon the plaintiffs executing the proper bond, the following order will be entered:

It is therefore considered by the Court, that the defendants, and each of them be enjoined, until the final hearing of this cause, or the further order of the Court, from using or permitting their employes to use, the trade mark *indicated* by exhibit " B," in plaintiffs' complaints, and heretofore used by them, or any mark of like similitude.

NOTE,—Perpetual injunction was granted against defendants, at the following May Term, and judgment rendered against them for damages and costs.—REP.

───────────────────────────────

NOTE.—No man has a right to dress himself in colors, or adopt and bear symbols, to which he has no peculiar, or exclusive right, and thereby personate another person, for the purpose of inducing the public to suppose, either

Sohl *et al v.* Geisendorf *et al.*

that he is that person, or that he is connected with, and selling the manufacture of such other person, while he is really selling his own." *Hilliard on Injunction, tit., Trade Marks,* 490, 2d *Ed.*

"An injunction will be granted, if purchasers using ordinary care are liable to be misled, though not if the two trade marks were seen side by side." *Same,* 491, *et seq.*

"There must be, between the genuine and fictitious marks, such general similarity, or resemblance of form, color, symbols, and such identity of words and their arrangement, as to have a direct tendency to mislead buyers, who exercise the usual amount of prudence, and caution. *Same* 493, *et seq. See also in Craft* v. *Day,* 7 *Beavan,* 88, *and in Partridge* v. *Menck,* 2 *Sandf. Ch.,* 624.

"The right to a trade mark, may in general, treating it as property, or as an accessory of property, be sold, and transferred upon a sale, and transfer of the manufactory of the goods, on which the mark has been issued, to be affixed; and may be lawfully used by the purchaser,"      *      *      *      *  and if they "continue to use the original name as a trade mark, they will be protected against any infringment of the exclusive right to that mark."      *

"The question in every such case must be, whether the purchaser, in continuing the use of the original trade mark, would, according to the ordinary usages of trade, be understood as saying more than, that he was carrying on the same business as had been formerly carried on by the person whose name constituted the trade mark. In such case I see nothing to make it improper for the purchaser to use the old trade mark, as the marks would in such a case indicate only that the goods so marked were made at the manufactory which he had purchased." 11 *House of Lords' Cases,* 533, 534.

For the infringement of a trade mark, the plaintiff is entitled to nominal damages, without proof that he has been deprived of any particular amount of profits by the defendant's unlawful act. *Burnet* v. *Phalon,* 21 *Howard Pr.,* 100; *Blofield* v. *Payne,* 4 *B. & Ad.,* 410.

But, "in practice, the plaintiff's remedy lies rather in the equitable 'security for the future,' than the legal 'indemnity for the past,' afforded by the Courts, as no definite rule seems to exist for the ascertainment of the extent of the actual damage." *Sedgwick on Damages,* 675, *n.*

In England, however, "it is held that the Court will only direct an account of the 'profits made by the defendants by means of the infringment,' and not of those of which the plaintiff has been deprived *See Elwood* v. *Christy,* 18, *C. B.* (*N. S.*), 494.

The jury may give vindictive damages, if the defendant is sued the second time. 1 *Story,* 336. *See also* 16 *Howard,* 480, 489; 1 *Blatchford, C. C. R.,* 244.

"If the mark used by the defendant bears such a resemblance to the plaintiff's trade mark, *though not an exact copy,* as is calculated to mislead

the public generally, who are purchasers of the article, and to make it pass with them for the one sold by him, it is an infringment." 4 *McLean,* 516; *see also Brightley's Fed. Digest, tit. " Trade Marks,"* 831.

The appropriation of any prominent, essential, or vital feature of a trade mark by another, is an infringment. If the trade mark is simulated in such manner as probably to deceive customers, the piracy may be checked by injunction. *Filley* v. *Fossett, Supreme Court of Mo.,* 1869, 4 *McLean,* 519; 2 *Barb. Ch.,* 103.

It is not requisite that the whole should be pirated, nor to show that any one has in fact been deceived. 2 *Sand. S. C.,* 607; 25 *Barb.* 79; 2 *Sand. Ch.,* 597. *See* 8 *Am. Law Reg. N. S.,* 402, *and authorities cited to case. See Upton on " Trade Marks."*